# In the United States Court of Federal Claims

**No. 11-543L**
**(Filed: February 27, 2013)**

| | | |
|---|---|---|
| **LONE STAR INDUSTRIES, INC.,** **Plaintiff,** **v.** **UNITED STATES OF AMERICA,** **Defendant.** | * | **Fifth Amendment Taking; Closure of Waterway Outlet; Property Interest; Motion to Dismiss for Failure to State a Claim upon Which Relief Can Be Granted; Rule 12(b)(6); LA. CIV. CODE ANN. art. 690, et seq.; Predial Servitude; Enclosed Estate; Regulatory Taking; Lack of Property Interest in Deep-Draft Access; Lack of Direct Regulation of Private Property.** |

David M. Flotte, Edward F. Kohnke, and Joseph E. Lee III, Preis & Roy, 601 Poydras Street, Suite 1700, New Orleans, La., 70130, for Plaintiff.

Ignacia S. Moreno and Charlotte M. Youngblood, United States Department of Justice, Environment & Natural Resources Division, 601 D Street, NW, Washington, D.C., 20004, for Defendant. David R. Dyer and Jennifer Labourdette Burck, United States Army Corps of Engineers, of Counsel.

---

## MEMORANDUM OPINION AND ORDER OF DISMISSAL

---

**WILLIAMS**, Judge.

The instant litigation arises from the 2009 closure of the Mississippi River Gulf Outlet ("MRGO"). Plaintiff Lone Star Industries, Inc. ("Lone Star"), brings this suit under the Fifth Amendment to the Constitution, alleging that the Government's closure of the MRGO resulted in a taking of deep-draft access to its property and of its real estate improvements in New Orleans, Louisiana. This matter comes before the Court on Defendant's Motion to Dismiss Plaintiff's First Amended Complaint for failure to state a claim upon which relief can be granted. Because Plaintiff has failed to allege a compensable property interest in deep-draft access to its property, Plaintiff has failed to state a plausible claim for a physical Fifth Amendment taking. In a similar vein, because Plaintiff has not alleged facts indicating that it was directly regulated by the

Government's closure of the MRGO, Plaintiff has failed to state a plausible claim for a regulatory taking of its deep-draft vessel terminal.

## Background

On March 29, 1956, Congress approved construction of the MRGO, a 76-mile, man-made navigation channel running northwest from the Gulf of Mexico to the Port of New Orleans.[1] Prior to construction of the MRGO, deep-draft vessels could reach New Orleans only by traveling 90 miles up the Mississippi River from the Gulf of Mexico.[2] The MRGO, which was constructed in the late 1950s and early 1960s, reduced that distance by approximately 40 river miles. A shallower channel that cannot accommodate deep-draft vessels, the Gulf Intracoastal Waterway ("GIWW"), runs west from the Gulf of Mexico and intersects with the MRGO near the MRGO's northern terminus. East of this intersection, the Michoud Canal runs north from the GIWW before terminating in New Orleans. The GIWW connects to the Mississippi River via the Inner Harbor Navigation Channel, which is too narrow to accommodate deep-draft vessels.

Congress authorized the MRGO to be dredged to a depth of 36 feet. In 2005, Hurricane Katrina caused massive shoaling in the channel, limiting the MRGO to a depth of 22 feet. In 2006, Congress passed the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery, Pub. L. No. 109-234, 120 Stat. 418 (2006), which provided that "the Secretary of the Army, acting through the Chief of Engineers . . . shall develop a comprehensive plan, at full Federal expense, to deauthorize deep-draft navigation on the [MRGO], extending from the Gulf of Mexico to the [GIWW] . . . ."

The Water Resources Development Act of 2007, Pub. L. No. 110-114, 121 Stat. 1041 (2007), provided that submission of the plan to de-authorize deep draft navigation to Congress would trigger de-authorization, and authorized the Secretary of the Army to close the MRGO. The Act also stated:

> There is authorized to be appropriated to the Assistant Secretary $85,000,000, to remain available until expended, to provide assistance pursuant to sections 209(c)(2) and 703 of the Public Works and Economic Development Act of 1965 (42 U.S.C. 3149(c)(2), 3233) to one or more eligible recipients under such Act to establish revolving loan funds to make loans for terms up to 20 years at or below market interest rates (including interest-free loans) to private businesses within the Port of New Orleans that may need to relocate to the Mississippi River within the State of Louisiana due to the treatment of the [MRGO] under title VII of this Act.

[1] A map of the MRGO and the surrounding area can be found in Appendix A.

[2] Plaintiff defines "deep-draft vessels" to include "both Panamax ships and Handymax ships and other ships used to carry dry cargo in bulk which are wider than 75 feet or have a draft of over 31.5 feet." Am. Compl. ¶ 3.

Id. at § 3082(b). These funds have yet to be appropriated. Am. Compl. ¶ 21.

In 2008, the Army Corps of Engineers submitted a "(Revised) Integrated Final Report to Congress and Legislative Environmental Impact Statement," triggering de-authorization of the MRGO. The Army subsequently contracted with Pine Bluff Sand and Gravel to deposit 430,000 tons of rock directly across the channel, a task which was completed on July 20, 2009. The finished rock dike makes it impossible for vessels to enter the MRGO.

Lone Star, a cement importer, owns a deep-draft terminal abutting the Michoud Canal at 14900 Intracoastal Drive, New Orleans, Louisiana. Lone Star describes its property as being located "on the Michoud Canal, just north of its intersection with the [MRGO]." Am. Compl. ¶ 1. Lone Star's property does not border on the MRGO. Water access to the MRGO from Lone Star's property is by way of the Michoud Canal, and then the GIWW.

As of the time Plaintiff filed its First Amended Complaint, it had invested approximately $100 million in a deep-draft import terminal and manufacturing facility on its property. Lone Star was the largest user of the MRGO on a tonnage basis.

## Procedural History

Lone Star filed its complaint in this Court on August 29, 2011, arguing that the Government, by effectively excluding deep-draft vessels from its import facility, had taken certain real estate improvements worth at least $61,480,800. Defendant moved to dismiss for failure to state a claim upon which relief can be granted. This Court denied Defendant's motion and granted Plaintiff leave to file an amended complaint. In granting Plaintiff leave to file an amended complaint, the Court asked Plaintiff to clarify its property interest and the legal grounds for its takings claims. Mem. Op. and Order Denying Def.'s Mot. to Dismiss Without Prejudice 5 (June 19, 2012).

Lone Star filed its First Amended Complaint on July 24, 2012, alleging a categorical or hybrid taking of a compensable property interest in deep-draft access to its terminal under both Louisiana and Federal law.[3] Am. Compl. ¶¶ 30, 32, 38. Additionally, Lone Star alleges a regulatory taking of a compensable property interest in "real estate and improvements." Id. at ¶¶ 37, 40. Lone Star does not contend that the closure of the MRGO violated the Water Resources Development Act ("WRDA"). Id. at ¶ 22. Rather, Plaintiff submits that the Act reflected "the Government's specific admission and acknowledgement that it had taken compensable property interests from Lone Star and for which Lone Star should be entitled to just compensation." Id. at ¶ 41. Defendant contests Lone Star's assertion of compensable property rights under state or Federal law, and has moved to dismiss Plaintiff's First Amended Complaint.

[3] In a status conference on August 13, 2012, the Court orally granted Plaintiff leave to file its First Amended Complaint, accepted that complaint for filing on that date, and ordered Defendant to respond to the First Amended Complaint by September 10, 2012.

## Discussion

### Jurisdiction

Under the Tucker Act, this Court "shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . ." 28 U.S.C. § 1491(a)(1) (2006); Cyprus Amax Coal Co. v. United States, 205 F.3d 1369, 1373 (Fed. Cir. 2000). The Tucker Act operates as a waiver of sovereign immunity, but does not create causes of action against the United States. United States v. Mitchell, 463 U.S. 206, 216 (1983); United States v. Testan, 424 U.S. 392, 398 (1976). "A claimant who is not relying upon breach of a contractual obligation, therefore, must look beyond 28 U.S.C. § 1491 and establish that some substantive provision of law, regulation, or the Constitution can be fairly construed as mandating compensation in order to state a claim within the jurisdiction of the court." Yancey v. United States, 915 F.2d 1534, 1537 (Fed. Cir. 1990) (citing United States v. Mitchell, 445 U.S. 535, 538 (1980)). The Takings Clause of the Fifth Amendment to the Constitution prohibits the taking of private property for public use "without just compensation." U.S. CONST. amend. V. "It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction." Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1309 (Fed. Cir. 2008); see also Moden v. United States, 404 F.3d 1335, 1341 (Fed. Cir. 2005).

### Defendant's 12(b)(6) Motion

Defendant moves to dismiss Lone Star's takings claim pursuant to Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC") asserting that Plaintiff failed to identify a cognizable property right on which to base its takings action.[4] To meet this Court's pleading requirements, Plaintiff must comply with Rule 8(a)(2) and proffer a "short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2); Martin v. United States, 96 Fed. Cl. 627, 629-30 (2011); see also Ashcroft v. Iqbal, 556 U.S. 662, 677-80 (2009) (analyzing the pleading requirements of Federal Rules of Civil Procedure 8(a)(2), which is identical to RCFC 8(a)(2)). Rule 8 does not require "'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678. To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Determining the plausibility of a claim for relief requires a context-specific analysis into whether the complaint demonstrates entitlement to relief. Id. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678. A federal court evaluating a

[4] Defendant also moves to dismiss any promissory estoppel claims under Rule 12(b)(1), for lack of subject-matter jurisdiction, but Plaintiff has abandoned that claim. Pl.'s Opp'n. to Def.'s Mot. to Dismiss the First Am. Compl. 10 ("Lone Star concedes that it is not pursuing a cause of action separate from its takings claim in this Court, and indeed has never been pursuing such a claim in this Court.").

motion to dismiss must accept all factual allegations as true, but it is not obliged "to accept as true a legal conclusion couched as a factual allegation." Bell Atl. Corp., 550 U.S. at 555.

The Federal Circuit employs a two-part test to determine whether a Government action amounts to a taking of private property. M&J Coal Co. v. United States, 47 F.3d 1148, 1153-54 (Fed. Cir. 1995); see also Maritrans, Inc. v. United States, 342 F.3d 1344, 1351 (Fed. Cir. 2003); Conti v. United States, 291 F.3d 1334, 1339 (Fed. Cir. 2002), cert. denied, 537 U.S. 1112 (2003). As a threshold matter, a plaintiff must prove the existence of a compensable property interest that the Government has allegedly taken. Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1212 (Fed. Cir. 2005); Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir. 2004). Indeed, "[i]t is essential in advancing a taking claim that a plaintiff establish that he is the owner of a compensable interest in property." Payne v. United States, 31 Fed. Cl. 709, 710 (1994) (citing Armstrong v. United States, 364 U.S. 40, 44-46 (1960)). The Constitution neither creates nor defines the universe of compensable Fifth Amendment property interests. Maritrans, Inc., 342 F.3d at 1352. "Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" Phillips v. Wash. Legal Foundation, 524 U.S. 156, 164 (1998) (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)); see also Maritrans, Inc., 342 F.3d at 1352 (recognizing that independent sources of property interests also include federal and common law); 120 Del. Ave., LLC. v. United States, 95 Fed. Cl. 627, 631-32 (2010) ("Courts look to state law 'to define the range of interests that qualify for protection as "property" under the Fifth and Fourteenth Amendments.'" (quoting Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1030 (1992)).

After identifying a compensable property interest, this Court then must analyze whether a Government action has effected a taking of that interest. Maritrans, Inc., 342 F.3d at 1351. If a plaintiff fails to allege a compensable property interest, however, the takings action must be dismissed summarily. See Air Pegasus of D.C., Inc., 424 F.3d at 1208 (affirming grant of summary judgment for defendant based on a lack of cognizable property interest in the navigable air space over plaintiff's heliport); Palmyra Pac. Seafoods, LLC v. United States, 561 F.3d 1361 (Fed. Cir. 2009) (affirming dismissal of takings claim for failure to articulate a compensable property interest in a contractual right to establish a commercial fishing operation). Here, Lone Star asserts that the Government's closure of the MRGO effected a taking of its property interests in deep-draft access and of its real estate and improvements on land abutting "the Michoud Canal, just north of its intersection with the [MRGO]." Am. Compl. ¶ 1.

**Plaintiff Has Failed to Allege a Compensable Property Interest in Deep-Water Access to Its Property under Louisiana Law**

Lone Star alleges that Louisiana law establishes its compensable property interest in the deep-draft, 36-foot access to its marine import and manufacturing facility. Am. Compl. ¶¶ 13, 30, 32. Lone Star contends that the MRGO represents a "right of passage under Louisiana Civil Code Article 690, et seq. including Articles 698, 705, 723, 726, 748, and Louisiana Revised Statutes, Title 9, Section 1251 et seq." Am. Compl. ¶ 32. Lone Star emphasizes that "Article 689 of the Louisiana Code provides a right of passage – a "predial servitude" in Louisiana parlance – to the owners of enclosed estates." Pl.'s Opp'n. to Def.'s Mot. to Dismiss 16 ("Pl.'s

Opp'n."). Plaintiff argues that, "instead of losing a preferred access point . . . Lone Star has no access point by which deep-draft ships can reach its ship-sized assets . . . ." Id. at 17. Lone Star suggests that, by cutting off deep-draft access to its facility, the Government's closure of the MRGO has rendered the property an "enclosed estate" with respect to deep-draft shipping activities. See id. at 16-17.

Lone Star alleges that its estate is "enclosed" while acknowledging that it continues to have access to a public "water route to the Lone Star facility via the Mississippi River and Industrial Canal . . . via Lake Pontchartrain . . . [and] from Lake Borgne using the Intracoastal Canal." Am. Compl. ¶ 20. The facility is likewise accessible by rail and truck. Id. The thrust of Lone Star's argument is that Article 689 requires "access sufficient to satisfy the owner's right of passage," and that Lone Star has lost sufficient access because it "has no access point by which deep-draft ships can reach its ship-sized assets." Pl.'s Opp'n. 17. Plaintiff also alleges that its position is supported by Louisiana Revised Statutes, Title 9 Section 1254, which states, in relevant part, that "[t]he owner of an enclosed estate who has no access to his estate other than by way of an existing waterway passing through neighboring property shall have a right and servitude of passage on such waterway." LA. REV. STAT. ANN. § 9:1254(A) (2011). According to Lone Star, this provision must be interpreted to mandate not just "any" access but "sufficient" access. Pl.'s Opp'n. 19.

In support of its argument, Lone Star cites the civil code provisions that embody Louisiana's law on predial, or real, servitudes. "A predial servitude is a charge on a servient estate for the benefit of a dominant estate. There must be two different estates, servient and dominant (with a benefit to the dominant estate), belonging to different owners." Marina Enters. v. Ahoy Marine Servs., 496 So. 2d 1080, 1082-83 (La. Ct. App. 1986) (internal citations omitted); LA. CIV. CODE ANN. art. 646 (2011). Pursuant to Article 723, "[p]redial servitudes may be established on public things, including property of the state, its agencies and political subdivisions." LA. CIV. CODE ANN. art. 723 (2011). A servitude of passage over another estate is a type of predial servitude, LA. CIV. CODE ANN. art. 699 (2011), and an enclosed estate "that has no access to a public road or utility may claim a right of passage over neighboring property to the nearest public road or utility." LA. CIV. CODE ANN. art. 689 (2011). "The right of passage for the benefit of an enclosed estate shall be suitable for the kind of traffic that is reasonably necessary for the use of that estate." LA. CIV. CODE ANN. art. 690 (2011).

The servitude of passage only applies, however, to estates that are truly enclosed by a complete lack of access to the nearest public thoroughfare. See LeBlanc v. Thibodeaux, 615 So. 2d 295, 298 (La. 1993) ("Civil Code Article 689 details the legal right of passage. It allows an owner of an estate that has no access to a public road to claim a right of passage over neighboring property to the nearest public road provided that the owner pays indemnity for the damage he causes.") (emphasis added); Vermillion Parish Sch. Bd. v. Broussard, 270 So. 2d 523, 524-25 (La. 1972) (referring to an enclosed estate as a "landlocked" estate). In defining enclosure, Louisiana law "does not take into account the inconveniences of the situation, nor the greater or less cost of reaching the railroads, refineries, or the public centers of business and trade, but contemplates the absolute inability of doing so without the right of way sought to be expropriated." Breaux v. Bienvenu, 25 So. 321, 323 (La. 1899). While enclosure may occur as a result of a restriction preventing the use of adjacent public roads, there must be an inability to

access any public road as a result. See, e.g., Rockholt v. Keaty, 237 So. 2d 663, 668 (La. 1970). Additionally, while the nature of passage for an enclosed estate is "to be governed according to the circumstances and as the exigencies of the case may require," a finding of enclosure is a prerequisite to finding a servitude of passage. Id.

Here, Lone Star requests the Court to reinterpret Louisiana jurisprudence to include a new definition of enclosure that hinges not on access to the nearest public road, but on access to the thoroughfare most conducive to the type of economic activity performed on its property. Plaintiff still maintains access to its property by public road, railroad, and several other public waterways including the Mississippi River and Industrial Canal, Lake Pontchartrain, and the Intracoastal Canal. Am. Compl. ¶ 20. The only type of access that has been eliminated is the deep-water access necessary to receive deep-draft shipping vessels. The provisions of Article 689 regarding right of passage sufficient for reasonable use are implicated only after an initial finding of enclosure due to complete lack of access to a public road. See Rockholt, 237 So. 2d at 668. While Lone Star makes clear that the closure of the MRGO has caused the company significant financial hardship, it has failed to support its interpretation of "enclosure" under Louisiana law.

The Louisiana Supreme Court admonishes against finding servitudes where they do not clearly exist. "Predial servitudes are in derogation of public policy because they form restraints on the free disposal and use of property. Therefore, servitudes are not entitled to be viewed with favor by the law and can never be sustained by implication." Palomeque v. Prudhomme, 664 So. 2d 88, 93 (La. 1995). In fact,

> When these elements are unclear or doubtful on the face of the title, a court may not supply them by implication or reform the language used in the title to broaden or restrict the terms of the original agreement. Doubt as to the existence, extent or manner of exercise of a servitude must be resolved in favor of the estate claimed to be burdened by the servitude.

St. Andrew's Place, Inc. v. City of Shreveport, 914 So. 2d 1203, 1210 (La. Ct. App. 2005) (citing LA. CIV. CODE art. 730, Mardis v. Brantley, 717 So. 2d 702 (La. Ct. App. 1998)). In this case, Lone Star has not made a plausible allegation that the MRGO is a servitude of passage under Louisiana law. Plaintiff has failed to allege any facts that would suggest that access to the MRGO for use of a particular type of vessel inhered in the title to its property. By virtue of access to several public waterways, a public road and a railway, Plaintiff's property is not an enclosed estate as defined under Louisiana law. This Court therefore finds that Plaintiff has not alleged a cognizable property right to deep-draft access under Louisiana law.

**Plaintiff Has Failed to Allege a Compensable Property Interest in Deep-Water Access to Its Property under Federal Law**

**Public Law 455**

Lone Star also submits that, under Federal law – Public Law 455 of 1956 – it has a right of deep-draft access to its facility. Am. Compl. ¶ 27. Plaintiff contends that "federal law

established a federal right of access by Public Law 455, which modified the then-existing MRGO project in accordance with a specific recommendation of the chief of engineers incorporating House Document 245 and its provisions for a 'permanent deep draft channel,' with a minimum depth of 36 feet." Pl.'s Opp'n. 15.

Public Law 455 states:

> *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the existing project for Mississippi River, Baton Rouge to the Gulf of Mexico, is hereby modified to provide for the Mississippi River-Gulf outlet to be prosecuted under the direction of the Secretary of the Army and supervision of the Chief of Engineers, substantially in accordance with the recommendation of the Chief of Engineers contained in House Document Numbered 245, Eighty-second Congress, at an estimated cost of $88,000,000: *Provided*, That when economically justified by obsolescence of the existing industrial canal lock, or by increased traffic, replacement of the existing lock or an additional lock with suitable connections is hereby approved to be constructed in the vicinity of Meraux, Louisiana, with type, dimensions, and cost estimates to be approved by the Chief of Engineers: *Provided further*, That the conditions of local cooperation specified in House Document Numbered 245, Eighty-second Congress, shall likewise apply to the construction of said lock and connection channels.

An Act to Authorize Construction of the Mississippi River-Gulf Outlet, Pub. L. No. 84-455, 70 Stat. 65 (1965).

There is nothing in the plain language of this Act to suggest that, in constructing the MRGO, Congress created a compensable property interest in perpetual deep-draft access for owners of property located near the MRGO. "When determining the meaning of a statute, we first look to the language of the statute itself . . . . If the language is clear, then the plain meaning of the statute will be regarded as conclusive." Delong v. Dep't. of Health & Human Servs., 264 F.3d 1334, 1339 (Fed. Cir. 2001) (internal quotations omitted); see also Bull v. United States, 479 F.3d 1365, 1376 (Fed. Cir. 2007) ("[W]here the statutory language provides a clear answer to [the question at issue], it ends there as well." (quoting Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999) (alterations in original))).

Contrary to Plaintiff's arguments, Public Law 455 makes no mention of perpetual maintenance of the MRGO to a minimum depth of 36 feet. Construed in the light most favorable to Plaintiff, Public Law 455 approved replacement of the existing lock or an additional lock subject to approval by the Army Corps of Engineers "when economically justified by obsolescence of the existing industrial canal lock or by increased traffic." This authorization is a far cry from the right to perpetual deep-water access Plaintiff would have this statute bestow.

**Water Resources Development Act**

While Plaintiff does not allege a separate cause of action under the Water Resources Development Act of 2007 ("WRDA"), Plaintiff argues that WRDA Section 3082 "constituted a specific acknowledgement by the Government that its action in permanently closing the MRGO deprived Lone Star and others similarly situated of property and property rights for which some compensation should be paid." Am. Compl. ¶ 22. Section 3082(b) of the WRDA reads:

> (b) REVOLVING LOAN FUND GRANTS. – There is authorized to be appropriated to the Assistant Secretary $85,000,000, to remain available until expended, to provide assistance pursuant to sections 209(c)(2) and 703 of the Public Works and Economic Development Act of 1965 (42 U.S.C. 3149(c)(2), 3233) to one or more eligible recipients under such Act to establish revolving loan funds to make loans for terms up to 20 years at or below market interest rates (including interest-free loans) to private businesses within the Port of New Orleans that may need to relocate to the Mississippi River within the State of Louisiana due to the treatment of the Outlet under title VII of this Act.

Pub. L. No. 110-114, § 3082, 121 Stat. 1041, 1127 (2007). Again, nothing in the text of this Act would support Plaintiff's interpretation that closing the MRGO deprived it of a property right. Plaintiff appears to argue that the Government intended to compensate businesses such as Lone Star that would have to move due to the MRGO's closure. Even if Plaintiff's interpretation is accurate, the establishment of a loan fund does not bestow a compensable property interest in deep-water access.

**The Navigational Servitude Eliminates Plaintiff's Claim to a Compensable Property Interest in Deep Water Access**

As explained above, Plaintiff has failed to make a facially plausible allegation that it has a compensable property interest in deep-draft access under Louisiana or Federal law. In addition, for the purposes of establishing a property interest to support a takings claim, any such interest would be subsumed by the federal navigational servitude. The Commerce Clause vests the Federal Government with control of the navigable waters of the United States for the regulation of commerce, and "confers upon the United States a dominant servitude" for that purpose. United States v. Rands, 389 U.S. 121, 123 (1967) (internal quotations omitted); see also Mildenberger v. United States, 91 Fed. Cl. 217, 247-48 (2010). The "title of the owner of fast land upon the shore of a navigable river to the bed of the river is, at best, a qualified one." United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 62 (1913). "[W]ithout being constitutionally obligated to pay compensation, the United States may change the course of a navigable stream, or otherwise impair or destroy a riparian owner's access to navigable waters." Rands, 389 U.S. at 123 (internal citations omitted); see also United States v. Commodore Park, Inc., 324 U.S. 386, 393 (1945) ("There is power to block navigation at one place to foster it at another. Whether this blocking be done by altering the stream's course, by lighthouses, jetties, piers, or a dam made of dredged material, the government's power . . . is derived from the same source-its authority to regulate commerce"). "[A]cts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their

consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision." Scranton v. Wheeler, 179 U.S. 141, 154 (1900) (holding that a landowner has no title to the downstream riverbed on which the Government built a pier such that he would be entitled to compensation for loss of access to his upland property) (quoting N. Transp. Co. v. City of Chicago, 99 U.S. 635, 642 (1878)).

The economic value attributable to a strategic riparian location is not a compensable property interest when diminished or destroyed by the United States in aid of navigation. See, e.g., United States v. Willow River Power Co., 324 U.S. 499, 509 (1945) ("[A] strategic position for the development of power does not give rise to right to maintain it as against interference by the United States in aid of navigation."); Miller v. City of New York, 109 U.S. 385 (1883) (affirming the dismissal of takings complaint for construction of bridge that prevented profit-generating, tall-mast ships from reaching plaintiff's warehouses); Nw. La. Fish & Game Pres. Comm'n v. United States, 79 Fed. Cl. 400, 411 (2007) (noting that Willow River Power Co. "has been consistently held to bar claims in which the property interest is dependent on the use of a navigable waterway"), aff'd, 574 F.3d 1386 (Fed. Cir. 2009). "[I]f the interests of navigation are served, it is constitutionally irrelevant that other purposes may also be advanced." United States v. Twin City Power Co., 350 U.S. 222, 224 (1956). The interests of navigation may, at times, require complete appropriation of the water flow for public purposes. Id. at 225, 228.

Lone Star alleges that the MRGO was closed after Congress de-authorized the MRGO under the WRDA, and "adopted the Army Corps' plan to build a rock dike across the MRGO at Bayou La Loutre." Am. Compl. ¶ 17. The WRDA states that it is "[a]n Act [t]o provide for the conservation and development of water and related resources, to authorize the Secretary of the Army to construct various projects for improvements to rivers and harbors of the United States, and for other purposes." Pub. L. No. 110-114, 121 Stat. at 1041. The WRDA sets forth express intent to improve navigation, as exemplified by Title I, Section 1004, which lists "Small Projects for Navigation," 121 Stat. at 1061, and Section 1009, "Small Projects to Prevent or Mitigate Damage Caused by Navigation Projects." 121 Stat. at 1067 (emphasis added).

Because the WRDA specifies Congress' navigational purpose in the development and alteration of waterways around the country, the de-authorization of the MRGO occurred in the Government's exercise of the navigational servitude. Lone Star undoubtedly had an economic interest in its riparian location. This economic interest, however, does not give rise to a right to maintain a deep-draft channel against interferences by the United States in aid of navigation. See Twin City Power Co., 350 U.S. 222; Willow River Power Co., 324 U.S. 499; Miller, 109 U.S. 385. The Government's navigational servitude as expressed in the WRDA prevents Lone Star from stating a plausible claim that the closure of the MRGO effected a taking of its property interest in deep-draft access.

**Plaintiff Has Failed to Allege Facts Supporting a Plausible Claim that the Government Effected a Regulatory Taking of the Improvements to Its Property**

Lone Star also contends that the Government's action in closing the MRGO has effected a regulatory taking of its compensable property interest in the "substantial improvements at the deep-draft vessel terminal." Pl.'s Opp'n. 1. Lone Star argues that the closure of the MRGO has

stranded and "render[ed] worthless certain real estate and improvements located at 14900 Intracoastal Drive." Am. Compl. ¶ 26. It posits that "the government's erection of a permanent Total Closure Structure across the MRGO has taken 'all economically beneficial use' of certain improvements at Lone Star's Michoud Canal facility, and effected a 'non-categorical' taking of other asset groups" that allow it to function as a deep-draft vessel terminal. Pl.'s Opp'n. 26. According to Plaintiff, the closure of the MRGO "unduly burdens Lone Star's private property to the point of diminishing its utility or value, because Lone Star's improvements either cannot be moved or moving them would be [so] expensive as to make moving them pointless." Am. Compl. ¶ 34.

A regulatory taking occurs when a Government regulation "goes too far" in burdening the use of private property. Pa. Coal Co. v. Mahon, 260 U.S. 393, 415 (1922) ("[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."); see also M&J Coal Co. v. United States, 47 F.3d 1148, 1153 (Fed. Cir. 1995) ("To determine whether a governmental regulation of property has gone so far as to effect a taking, courts have engaged in an essentially ad hoc, factual inquiry . . . .") (internal quotations omitted). However, the Court must still make the threshold takings inquiry into whether the Plaintiff has claimed a compensable Fifth Amendment property interest in the right to that use. Am. Pelagic Fishing Co., 379 F.3d at 1372 ("It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation.") (quoting Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001). Indeed, "even when a governmental land use regulation deprives a claimant of all economically beneficial use of his property, the government may avoid compensation if 'the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with.'" M&J Coal Co, 47 F.3d at 1153 (quoting Lucas v. S. C. Coastal Council, 505 U.S. 1003, 1027 (1992)).

Identification of property interests for the purposes of regulatory takings analyses requires an inquiry into the "bundle of sticks" in the plaintiff's title to its property. Hearts Bluff Game Ranch, Inc. v. United States, 669 F.3d 1326, 1328 (Fed. Cir. 2012) (affirming that "Hearts Bluff did not have a property interest that could be subject to a Fifth Amendment taking because a mitigation banking instrument is not 'an inherent stick in a landowner's bundle.'"), cert. denied, 132 S. Ct. 2780 (2012) (mem.); see also Colvin Cattle Co. v. United States, 468 U.S. 803, 808 (Fed. Cir. 2006) (stating that because "Colvin's water rights do not have an attendant right to graze, no governmental action restricting Colvin's ability to graze on federal land can affect its water right in a manner cognizable under the Fifth Amendment."). As the Federal Circuit has recognized, in takings jurisprudence, "there is a distinction between simply not being disturbed in the particular use of one's property and having the right to the use of the property. Clearly, in order for there to be a cognizable property interest sufficient to support a takings claim, the latter must be true." Am. Pelagic Fishing Co., 379 F.3d at 1377 (emphasis in original).

The failure to establish a right to a particular use renders a takings claim based on that right "fatally defective." Id. at 1383. An owner's interest in a specific economic use of its property, such as that conferred by license, does not lead to a finding of a compensable Fifth Amendment property interest. Id.; Air Pegasus of D.C., Inc., 424 F.3d at 1217 (affirming that the property interest in the lease of land for use as a heliport does not include a compensable

interest in access to navigable airspace, because "navigable airspace is public property not subject to private ownership.").

Here, Lone Star alleges that the Government's closure of the MRGO "has taken away 'all economically beneficial use' of certain improvements at Lone Star's Michoud Canal facility and a 'non-categorical' taking of other asset groups." Pl.'s Opp'n. 26; see also Am. Compl. ¶ 29. Importantly, however, Lone Star has not plausibly alleged that the ability to use its property as a deep-draft vessel terminal is a right that inheres in its title to that property. Thus, Plaintiff has not alleged facts indicating that its ownership of this facility located on the Michoud Canal just north of the Canal's intersection with the MRGO carried with it the perpetual right to deep-draft access via the MRGO to its facility.

Nor has Plaintiff demonstrated that the closure of the MRGO constituted a direct regulation of its facility. See Air Pegasus of D.C., Inc., 424 F.3d at 1216 ("Air Pegasus, which did not itself own or operate any helicopters, does not allege that the FAA's restrictions regulated its operations under the lease . . . . Air Pegasus, while no doubt injured by reason of the government's actions, has not alleged a taking of private property under the Fifth Amendment.") (emphasis in original). When an economic injury is not the result of the Government's direct regulation of a plaintiff's property, but rather is derivative of Government regulation of some other party or property, there is no viable claim for a regulatory taking. See Huntleigh USA Corp. v. United States, 525 F.3d 1370, 1380 (Fed. Cir. 2008) ("[The act] did not, however, regulate Huntleigh directly. Rather, it modified governmental regulation of the airlines, which resulted in adverse economic consequences for Huntleigh."); see also Palmyra Pac. Seafoods, Inc., 561 F.3d at 1366 ("The fact that the government's regulation of activities in the waters surrounding Palmyra may have adversely affected the value of their contract rights to engage in activities on shore is not sufficient to constitute a compensable taking.").

Lone Star alleges that the closure of the MRGO has caused it to suffer economic loss, specifying that "[u]nadjusted for inflation, [it has] spent in excess of $115 million to purchase and improve a deep-draft cement importation terminal." Pl.'s Opp'n. 26. It alleges that its improvements "are effectively stranded . . . because those improvements cannot be moved without destroying them, or alternately because moving said improvements would be so expensive as to render moving them pointless . . . ." Am. Comp. ¶ 40. However, Lone Star has failed to claim that its facilities have been directly regulated by the closure of the MRGO. Lone Star's failure to allege how its property or operations were regulated by the Government's closure of the MRGO is an additional death knell to its regulatory takings claim. See Palmyra Pac. Seafoods, Inc., 561 F.3d at 1370 ("While it might be different if the government regulated activities on a private individual's property . . . that is another matter altogether from the government regulating activities on its own property, or property over which it has full control, even if that regulatory action disappoints the expectations of nearby property owners"); Huntleigh USA Corp., 525 F.3d at 1380.

## **Conclusion**

Plaintiff has failed to allege a compensable property interest in deep-draft access to its property under Louisiana or Federal Law. Plaintiff has likewise failed to allege that its facilities or operations were directly regulated by the Government's closure of the MRGO. As such,

Plaintiff has failed to allege facts giving rise to a plausible physical or regulatory takings claim. The Court therefore grants Defendant's Motion to Dismiss Plaintiff's Amended Complaint for failure to state a claim upon which relief can be granted.

**s/** Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**

**Appendix A**[5]

[5] These maps were first presented as Exhibit B to Defendant's First Motion to Dismiss.